# District Court of the Navajo Nation
## Judicial District of Window Rock, Arizona

**The Navajo Nation; The Navajo Tribal Council;
Leonard Haskie, Interim Chairman of the Navajo Tribal Council;
and Irving Billy, Interim Vice Chairman of the Navajo Tribal Council,
Plaintiffs,
v.
Chairman Peter MacDonald, Sr.;
Vice Chairman Johnny R. Thompson, et al.,
Defendants.
Decided May 17, 1989**

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

Stanley Pollack, Assistant Attorney General, Violet A. P. Lui, David P. Frank, Attorneys, Navajo Nation Department of Justice, counsels for Plaintiffs.

Thomas J. Hynes, Hynes, Hale, and Fortner Law Firm, Daniel Deschinny, Sr., counsels for Defendants, and Carol Kirk Retasket, appearing Pro se.

Judge Robert Yazzie, Presiding.

## INTRODUCTION

This matter having come for hearing on May 2-4, 1989, on Plaintiffs' Complaint for Injunctive and Declaratory Relief, this Court having heard only the Plaintiffs' evidence (Defendants presented no evidence at trial) and the parties' legal arguments on the issue of whether the Navajo Tribal Council's act of placing Chairman Peter MacDonald and Vice Chairman Johnny R. Thompson on Administrative leave with pay is valid, the Court makes the following Findings, Opinion and Order:

## FINDINGS OF FACT

1. At trial, Plaintiffs introduced transcripts of hearings held before the United States Senate Select Committee on Indian Affairs on February 2, 6, and 7, 1989. Serious allegations made under oath included:

(a) Defendant MacDonald (i) solicited and received bribes and kickbacks from contractors doing business with the Navajo Nation;[1] (ii) realized personal profits

---

1. Navajo Nation exhibit 3, transcript of the Senate Select Committee Hearings of February 2, 6 and 7, 1989 (hereafter "Exhibit 3"), 2/2/89 at 28-29, 37-42, 52, 69-72, 78-79, 90-93.

2. Exhibit 3, 2/7/89 at 44-45, 51-53, 55-61, 66-67, 69, 124-125.

from the purchase of the Big Boquillas Ranch by the Navajo Nation;[2] and (iii) conspired with others to cover-up such unlawful actions and encouraged others to commit perjury in investigations concerning payoffs from the Big Boquillas transactions;[3] and

(b) The MacDonald-Thompson campaign solicited and received monetary contributions and services of value from non-Navajo and Navajo contractors.[4]

2. The campaign expense report for the MacDonald-Thompson campaign, *combined* with the Senate Select Committee testimony, reveals that Defendants MacDonald and Thompson:

(a) failed to report the contributions alleged to have been made by the contractors;[5] (b) failed to report the non-Navajo sources of these contributions;[6] and (c) would have exceeded the $84,192 campaign expense limitation for the 1986 general election for Chairman and Vice Chairman of the Navajo Tribal Council had they reported all expenses, including over $39,000 worth of air transportation services provided by James Paddock.[7]

3. The minutes of the 1989 Winter Session of the Navajo Tribal Council and the resolutions adopted by the Council:

(a) The Navajo Tribal council convened the Winter Session on February 14, 1989.[8] The Winter Session agenda was adopted by a vote of 53-29-4.[9] The agenda included a resolution adopting procedures for presentation of resolutions and a resolution placing the Chairman and Vice Chairman on administrative leave with pay;[10]

(b) At the February 16, 1989 session, Chairman MacDonald voluntarily placed himself on administrative leave and left the Council Chambers;[11]

(c) On February 17, 1989, the Council adopted:

(i) Resolution CF-3-89 establishing the Office of Special Prosecutor to conduct investigations into the allegations raised before the Senate Select Committee; [12]

(ii) Resolution CF-4-89 placing the Chairman on Administrative leave with pay, by vote of 49-13-5,[13] finding that "a state of emergency exists in the management of the Navajo Tribal Council caused by the unique circumstances and events relating to the office of the Chairman and the serious allegations raised

---

3. Exhibit 3, 2/2/89 at 32-33; 2/6/89 at 99-102, 106-107, 113; and 2/7/89 at 75-79, 93-102, 124-125.

4. Exhibit 3, 2/2/89 at 28-29 (including Paddock exhibit list of payments and gratuities to MacDonald), 68-69.

5. Navajo Nation Exhibit 4, Candidate's Campaign Expense Statement for Peter MacDonald, 11/20/86.

6. Exhibit 4.

7. Exhibit 4; and Exhibit 3, 2/2/89 at 28-29 (see also Paddock exhibit list of payments and gratuities to MacDonald, and testimony of Gloria Dennison).

8. Navajo Nation Exhibit 1, Minutes of the 1989 Winter Session of the Navajo Tribal Council, 1 N.T.C. 2/14/89.

9. *Id.* at 57.

10. Exhibit 1, 2/15/89 at 1-2.

11. Exhibit 1, 30 N.T.C. 2/16/89.

12. Exhibit 2, Resolution CF-3-89, 2/17/89.

13. Exhibit 2, Resolution CF-4-89, 2/17/89; Exhibit 1, 2/17/89 at 33.

personally against Peter MacDonald, Sr.";[14]

(d) On March 1, 1989, the Tribal Council adopted Resolution CMA-6-89[15] authorizing the Department of Justice to Institute Legal Proceedings Regarding the Big Boquillas Ranch Transaction. The Tribal Council made the following factual finding: "The actions of the Chairman and Vice Chairman of the Navajo Tribal Council purporting to terminate the Attorney General and Deputy Attorney General constitute deliberate use of the Chairman's and Vice Chairman's office powers to interfere with and/or subvert Council action regarding the status of the Chairman and Vice Chairman, as well as legal action concerning possible ethical violations of public officials in connection with Big Boquillas and other matters arising out of the Senate Investigation Hearings."; and[16]

(e) On March 10, 1989, the Navajo Tribal Council adopted Resolution CMA-10-89 placing the Vice Chairman on administrative leave with pay, by a vote of 37-2-6. A quorum of 46 Council delegates were present. Defendants offered no evidence that a quorum did not exist.[17] Pursuant to CMA-10-89, the Council made several determinations including:

(i) "Vice Chairman Johnny R. Thompson is unwilling and has failed to carry out the duties and the obligations of the Office of the Chairman and failed to promote and preserve the interest of the Navajo Nation."[18]

(ii) "Johnny R. Thompson ... has indicated that he will be subject to the influence of Peter MacDonald, Sr., in the exercise of authority of the office defeating the purpose of Resolution CF-4-89."[19]

(iii) "Vice Chairman Johnny R. Thompson himself is implicated by allegations that the MacDonald/Thompson candidacy filed fraudulent campaign contribution and expense reports with the Navajo Election Committee and accepted campaign contributions from non-Navajos, which are grounds for disqualification from office."[20]

4. Defendant Thompson has admitted that at all time relevant to this action, he has acted under the direction and authority of Defendant MacDonald.[21]

---

14. Exhibit 1, 2/17/89 at 25; Exhibit 2, CF-4-89 at para. 3.

15. Exhibit 2, Resolution CMA-6-89; Exhibit 1, 2 N.T.C. 3/1/89.

16. Exhibit 1, 4 N.T.C. 3/1/89; Exhibit 2, Resolution CMA-6-89 at para. 15.

17. Exhibit 1, 17 N.T.C. 3/10/89; Exhibit 2, CMA-10-89.

18. Exhibit 2, CMA-10-89 at para. 3.

19. *Id.* at para. 4.

20. *Id.* at para. 5.

21. Statements made by Daniel Deschinny, Sr., as Counsel for Defendant Thompson in opening remarks and in motion for Directed Verdict; Navajo Nation Exhibit 5, Memorandum to Michael P. Upshaw, 2/21/89; Navajo Nation Exhibit 5, Memorandum to Anthony P. Lincoln, 3/7/89; Navajo Nation Exhibit 7, letter to Eric N. Dahlstrom, 3/9/89; Navajo Nation Exhibit 8, Memorandum to Richie Nez, 3/21/89; Navajo Nation Exhibit 9, Memorandum to Carol Retasket, 3/21/89; Navajo Nation Exhibit 10, Memorandum to Eric N. Dahlstrom, 2/17/89; Navajo Nation on Council Exhibit 11, Memorandum/Executive Order to Wilbur Kellogg, 3/10/89; Navajo Nation Exhibit 12, Memorandum/Executive Order to Wilbur Kellogg on Chairman and Vice-Chairman, 3/10/89; Navajo Nation Exhibit 13, Memorandum to James Henderson, 3/10/89; Navajo Nation Exhibit 14, Memoranda signed by Defendant MacDonald as Chairman; Adverse inference drawn from Defendant MacDonald's failure to answer question on point.

Subsequent to the Chairman being placed on administrative leave and being divested of all executive and legislative authority on February 17, 1989, Vice Chairman Thompson continued to act under the direction and authority of Chairman MacDonald by:

(a) attempting to take the following actions in consort with Defendant MacDonald:

(i) firing the Attorney General,[22] (ii) appointing an Executive Secretary,[23] (iii) restraining the Deputy Attorney General from giving legal advice to the Tribal Council,[24] (iv) issuing orders to the Chief of Police,[25] (v) firing the Director of Legislative Affairs,[26] (vi) appointing an Attorney General,[27] and (vii) appointing a Deputy Attorney General;[28] and

(b) under his own authority, but subject to the direction of Defendant MacDonald, Defendant Thompson:

(i) attempted to fire the Deputy Attorney General on February 17, 1989 on the instructions of Chairman MacDonald, after the Deputy Attorney General gave legal advice contrary to the Chairman's wishes, and after the Attorney General had recommended the appointment of a Special Prosecutor to investigate wrongdoing arising from the Big Boquillas purchase;[29]

(ii) signed documents after February 17, 1989 under executive authority as delegated by Chairman MacDonald;[30] and

(iii) failed to deliver the preliminary Hawkins Report investigating the Big Boquillas transaction to the Navajo Tribal Council after it was presented to a special session of the Advisory Committee and Budget and Finance Committee which Defendant Thompson chaired.[31]

5. The foregoing facts demonstrate serious allegations of a breach of trust by Defendants MacDonald and Thompson which threatened, directly and indirectly, the property and resources of the Navajo Nation, and the political integrity, economic security and health, safety and welfare of the Nation.[32]

6. The foregoing facts further demonstrate that Resolutions CF-4-89 and CMA-10-89 placing Chairman MacDonald and Vice Chairman Thompson on administrative leave do not constitute removal but rather an administrative leave.

7. Defendants did not present any evidence that the administrative leave resolutions CF-4-89 and CMA-10-89 are invalid or that these resolutions constitute bills of attainder.

---

22. Exhibit 5, see n. 22.
23. Exhibit 6, see n. 22.
24. Exhibit 7, see n. 22.
25. Exhibits 11 and 12, see n. 22.
26. Exhibit 13, see n. 22.
27. Exhibit 8, see n. 22.
28. Exhibit 9, see n. 22.
29. Exhibit 10, see n. 22.
30. Exhibits 10, and 14.
31. Testimony of Defendant Thompson, 5/3/89; Exhibit 2, Resolution CMA-10-89.
32. All evidence submitted and judicial notice.

8. At the conclusion of the trial, Defendants MacDonald and Thompson stipulated with the plaintiffs, on record, that they still do not recognize Resolutions CF-4-89 and CMA-10-89 as valid, and as such, they have always exercised full authority of their official capacity despite being placed on administrative leave with pay.

## OPINION

The Court will address these issues pursuant to the guidelines set out by the Navajo Supreme Court:

1. WHETHER THE NAVAJO TRIBAL COUNCIL HAD REASONABLE GROUNDS TO BELIEVE THAT CHAIRMAN PETER MACDONALD, SR. OR VICE CHAIRMAN JOHNNY R. THOMPSON SERIOUSLY BREACHED THEIR FIDUCIARY TRUST TO THE NAVAJO PEOPLE AND THE ADMINISTRATIVE LEAVE WOULD BE IN THE BEST INTEREST OF THE NAVAJO PEOPLE.

2. WHETHER THE TERMS OF NAVAJO TRIBAL COUNCIL RESOLUTIONS CF-4-89 AND CMA-10-89 CONSTITUTE ADMINISTRATIVE LEAVE OR REMOVAL.

3. WHETHER THE NAVAJO TRIBAL COUNCIL RESOLUTIONS PLACING CHAIRMAN PETER MACDONALD, SR. AND VICE CHAIRMAN JOHNNY R. THOMPSON ON ADMINISTRATIVE LEAVE AFFORD THE BASIC PROTECTIONS REQUIRED BY THE NAVAJO SUPREME COURT.

4. WHETHER THE NAVAJO TRIBAL COUNCIL RESOLUTION CF-4-89 OR CMA-10-89 PLACING CHAIRMAN PETER MACDONALD, SR. AND VICE CHAIRMAN JOHNNY R. THOMPSON ON ADMINISTRATIVE LEAVE CONSTITUTE BILL OF ATTAINDER.

Legislative acts are presumed valid. This presumption of validity attaches from the moment legislation is passed and remains until rebutted. *Benally v. Gorman*, 5 Nav. R. 273, 275 (W.R.D.C., 1987); *Damon v. MacDonald*, 4 Nav. R. 138, 140 (W.R.D.C., 1983); *Kelly v. Johnson*, 425 U.S. 238, 247 (1976). If a legislative act is subjected to judicial review and the court subsequently makes a decision that the act is valid, it does not become valid from the date of that decision but, because of the presumption of validity, the act is valid from the point of passage. In the event a legislative act is declared invalid as a result of judicial review, it is not necessarily a nullity or retroactively invalid. For example, an officer appointed to a public post under a statute subsequently held to be invalid is treated in law as a *de facto* officer. His acts during the period before the statute was held invalid are binding upon the community. *State v. Carroll*, 38 Conn. 449 (1871), cited with approval in *Norton v. Shelly Country*, 118 U.S. 425 (1886).

> When a court is faced with reviewing any legislative action, that review must be conducted under certain principles. The main principle of judicial review is the presumption that the legislative act is proper and legal. The word 'pre-

sumption' is a legal term which means that a thing is accepted as true or proven unless the presumption is rebutted by evidence to the contrary. One of the factors in determining whether an act is proper or legal is whether the legislative action is rationally related to legitimate governmental purpose. *Benally, supra.* at 275.

The Navajo Rules of Evidence recognizes the general rule on presumptions: Rule 6, *Presumptions,* states:

> In all cases not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

The plaintiffs sued Chairman Peter MacDonald, Vice Chairman Johnny R. Thompson, and other defendants in their individual capacities, seeking declaratory relief and a permanent injunction. A temporary restraining order was sought and granted.

The declaratory and injunctive relief sought by Plaintiffs was:

1) This court preliminarily and permanently enjoin defendants from attempting to exercise any official powers and duties as officials, employees, or agents of the Navajo Nation; and

2) This Court enter a declaratory judgment that any act or action taken by defendants MacDonald and Thompson, after being placed on leave, and by other defendants upon their termination of employment by the Interim Chairman, are null and void.

The defendants requested a Writ of Prohibition from the Navajo Nation Supreme Court on the basis that the action was barred by the Navajo Nation Sovereign Immunity Act, 1 N.T.C. § 354 (g) (1) and (3).

The plaintiffs asserted that the Chairman and Vice Chairman had been relieved of their executive and legislative powers and put on administrative leave with pay. They therefore had no official capacity and could not invoke the protection of the Sovereign Immunity Act.

The Supreme Court determined that whether the Sovermign Immunity Act was a bar required findings of fact as to the official capacity of the defendants and denied the request for the writ. *MacDonald v. Yazzie*, 6 Nav. R. 95 (1989).

The next proceeding involved a hearing on the temporary restraining order. At that hearing the District Court certified four questions to the Navajo Nation Supreme Court. The fourth question was: Does the Navajo Tribal Council have the authority to relieve the Chairman of the Navajo Tribal Council and the Vice Chairman of the Navajo Tribal Council of their executive and legislative authority and place them on administrative leave with pay? The District Court extended the time period of the TRO pursuant to Rule 18 of the Navajo Rules of Civil Procedure.

The Supreme Court answered certified question Number 4 with a conditional

yes. The Chairman and Vice Chairman may be put on administrative leave with pay and relieved of their executive and legislative authority if certain conditions are met.

The *first condition* is two-pronged: 1) the Tribal Council must have reasonable grounds to believe that the Chairman or Vice Chairman has seriously breached his fiduciary trust to the Navajo people and; 2) administrative leave will be in the best interests of the Navajo people.

The Supreme Court then identified "reasonable grounds to believe that the official seriously breached his fiduciary trust to the Navajo people":

1. Serious allegations of breach of fiduciary duty solicited under oath by a properly authorized investigatory body.
2. Serious allegations of criminal conduct which would amount to a felony solicited under oath by a properly authorized investigatory body.
3. Serious allegations combined with some evidence of any of the grounds for removal set out in 11 N.T.C. § 211.
4. Serious allegations combined with some evidence of violation of tribal law which, if true, could result in removal.
5. Actual felony charges in federal or state court.
6. Criminal charge or civil suit arising from violation of the public trust in the Navajo courts.

The *second condition* is that the action in fact be administrative leave and not removal.

The *third condition* is that certain basic protections be afforded. These protections are:

1. The action must occur in a properly convened session of the Navajo Tribal Council at which a quorum is present.
2. There must be a properly adopted agenda.
3. The resolution by which the official is placed on leave must pass by a majority vote.
4. The resolution by which the official is placed on leave must not be a bill of attainder.

Resolutions CF-4-89 and CMA-10-89 are acts of the legislative body and the presumption of validity attached at the moment of passage by the Tribal Council. The presumption is valid until rebutted. The burden of rebuttal is on those contesting the validity of the resolutions, in this case the defendants.

The response to certified question Number 4 by the Supreme Court provides the elements necessary to rebut the presumption of validity.

At trial defendants presented no evidence, either documentary or testamentary, on any issue.

As to the issue of validity of the two resolutions, plaintiffs' burden of evidence consisted of introducing certified copies of the resolutions. At that point the burden of evidence shifted to the defendants to rebut the presumption of validity. In

order to rebut a presumption, there must be evidence sufficient to overcome the presumption. The test in this case is not whether plaintiffs produced evidence to support the presumption but whether defendants produced evidence to rebut it. The defendants wholly failed to meet their burden. The plaintiffs proceeded, however, to support the presumption of validity through the introduction of evidence relevant to the guidelines established by the Supreme Court.

The Court chooses to identify the evidence which supports the Court's conclusion on each of the elements in the Supreme Court response to certified question 4 and ultimately on the validity of the two resolutions. In addition, the Court will take notice of certain statutes contained in the Navajo Tribal Code.

Minutes of Tribal Council meetings from February 14, 1989 through March 10, 1989, were admitted into evidence. These minutes show procedural matters, content of discussion, knowledge of Tribal Council delegates and intent of the legislature. They were not admitted as proof that any allegations against any tribal officials are true.

Again, transcripts of certain portions of the hearings before the Senate Select Committee were admitted into evidence. They were not admitted as to the truth of any allegations but that the allegations had been made.

According to the Supreme Court's response to certified question Number 4, Tribal Council is not required to conduct a formal evidentiary hearing before putting a Chairman or Vice Chairman on administrative leave. Tribal Council is required only to have reasonable grounds to believe that a breach of fiduciary trust has occurred and that administrative leave is in the best interests of the Navajo people. The Supreme Court said administrative leave is not a deprivation of life, liberty or property and that the due process (notice, hearing, opportunity to be heard, etc.) attendant to those deprivations do not apply. *In the Matter of: Certified Questions II: Navajo Nation v. MacDonald*, 6 Nav. R. 105, 118-119 (1989). The due process applicable to placing a Chairman or Vice Chairman on administrative leave is found in the conditions the Supreme Court set out for administrative leave. *Id.*

## RESOLUTION CF-4-89

I. Tribal Council had reasonable grounds to believe that Peter MacDonald, Sr., has seriously breached his fiduciary trust to the Navajo people and that administrative leave was in the best interests of the Navajo people.

### BREACH OF FIDUCIARY TRUST

A. There were serious allegations of breach of fiduciary duty solicited under oath by a properly authorized investigatory body.

1. Navajo Nation Exhibit 3, 2/2/89, Hearings before the Special Committee on Investigations, Select Committee on Indian Affairs, United States Senate at 28-29, 37-42, 52, 69-72, 78-79, 90-93 and

Exhibit 3, 2/7/89 hearing, at 44-45, 51-53, 55-61, 66-67, 69, 124-125.
2. Navajo Nation Exhibit 1, Tr. 2/14/89, pp. 30-31 (Statement of Peter MacDonald, Sr.):

I want to first say that I am here before you, as all of you knew, accused of one of the most serious crimes I can think of, betraying the trust that the Navajo people put in me, selling the power of my office for personal gain, enriching myself at the expense of the people who are among the poorest of the poor in America. That's what I have been accused of. I am outraged at these charges, but I know you must be outraged at something else too as we talk here today and yesterday. You must be outraged at the Navajo Tribal Government, not just me, but the whole tribal government has been held up as corrupt, pervaded by kick backs, payoffs and favoritism.

3. Defendants presented no evidence on the issue of whether there were serious allegations of breach of fiduciary duty.

Although the breach of fiduciary trust refers to that which belongs to the people, it is Tribal Council who determines whether there are reasonable grounds to believe that the trust has been breached. It is also Tribal Council who determines whether administrative leave is in the best interests of the Navajo people.

The transcript of the hearings before the Senate Select Committee contains allegations that Chairman MacDonald solicited and received bribes and kickbacks from contractors doing business with the Navajo Nation, perpetrated a fraud on the Navajo Nation in the purchase of the Big Boquillas Ranch and realized a personal profit from the Big Boquillas transaction. These are allegations of breach of fiduciary duties.

Fiduciary duties are those involved in handling the money and affairs of others with diligence, with good faith, and with disclosure of opportunity for private gain or benefit.

A review of the Tribal Council minutes from February 14, 1989, through February 17, 1989, show that all Tribal Council delegates who spoke were aware of the allegations made to the Senate Select Committee and that many had listened to audio tapes or seen video tapes of portions of those hearings. Some delegates had been directed by their chapters to take some action in regard to the allegations.

The Tribal Council minutes for those days show that much discussion was devoted to the allegations and what action should be taken in response to those allegations.

Finally, the statements of Chairman MacDonald summarize the allegations and, if any member of Tribal Council was unaware of the allegations, the statements of Chairman MacDonald were a source of information.

B. There were serious allegations of criminal conduct which would amount to a felony solicited under oath by a properly authorized investigatory body.
a. Navajo Nation Exhibit 3, 2/2/89, Hearings before the Special

Committee on Investigations, Select Committee on Indian Affairs, United States Senate at pp. 32-33; 2/6/89 Hearing at pp. 99-102, 106-107 and 113; 2/7/89 Hearing at pp. 75-79, 93-102 and 124-125.

b. Navajo Nation Exhibit 1, Tr. 2/14/89-2/17/89 (Discussion of Tribal Council Delegates).

c. Navajo Nation Exhibit 1, Tr. 2/14/89, pp. 30-31 (Statement of Peter MacDonald, Sr. set out above).

d. Defendants presented no evidence on the issue of whether there were serious allegations of criminal conduct.

Plaintiffs' evidence confirmed serious allegations against Chairman MacDonald made under oath by witnesses testifying before the Senate Select Committee which, if the allegations were brought as criminal charges, would constitute subornation of perjury (18 U.S.C. § 1622); obstruction of congressional proceedings (18 U.S.C. § 1505); obstruction of criminal investigations (18 U.S.C. § 1510); and conspiracy (18 U.S.C. § 371).

As stated above, the Tribal Council minutes show that the delegates were aware of the proceedings before the Senate Select Committee and that Chairman MacDonald acknowledged there were serious allegations.

C. There were serious allegations combined with some evidence of violation of tribal law which, if true, could result in removal.

1. 11 N.T.C. § 175. Limitation on expenditures by or on behalf of candidates; radio or television time

(a) The following sums shall be the maximum amounts which may be expended by or on behalf of any candidate in any Tribal Election. When anything of value other than money is expended or used by or on behalf of any candidate, it shall be considered as equivalent to money at its fair cash value. Necessary personal, traveling or subsistence expenses of any candidate himself shall not be included in the limitation and need not be reported.

(1) For the Office of the Chairman and Vice Chairman (combined sum) one dollar for each registered voter.

2. Navajo Nation Ethics in Government Law, 2 N.T.C. § 3751 *et seq.*, one of the penalties for which is removal or suspension from office. 2 N.T.C. § 3757, (a) (1), (C).

3. Navajo Nation Exhibit 1, Tr. 2/14/89-3/10/89 (Tribal Council Delegates' discussion).

4. Navajo Nation Exhibit 1, Tr. 2/14/89, pp. 30-31 (Statements of Peter MacDonald, Sr. set out above).

5. Navajo Nation Exhibit 3, 2/2/89 Hearing at pp. 28-29, 68-72 (The MacDonald-Thompson campaign solicited and received monetary contributions and services of value from non-Navajo and Navajo Contractors) and Exhibit 3 attachments to Hearing transcript (list of payments and gratuities made by John Paddock to Chairman MacDonald).

6. Navajo Nation Exhibit 4, Candidate's Campaign Expense Statement for Peter MacDonald, Sr., 11/20/86.

7. Defendants presented no evidence on the issue of whether there were serious allegations of violation of tribal law.

The Plaintiffs' evidence confirmed serious allegations made before the Senate Select Committee which suggests a violation of the Navajo election laws for knowingly filing a false report which failed to disclose contributions of a non-Navajo, the penalty for which is removal from office. 11 N.T.C. § 177. Such testimony also demonstrates alleged violations of the campaign expense ceiling (11 N.T.C. § 175), with a penalty of removal from office. 11 N.T.C. § 176.

The Plaintiffs' evidence also confirmed that the testimony contained serious allegations of conduct which is unlawful under the Navajo Nation Ethics in Government Law, 2 N.T.C. § 3751 *et seq.*, one of the penalties for which is removal or suspension from office. 2 N.T.C. § 3757 (a) (1) (A), (C). Among the allegations of misconduct under the Ethics Law are: using official authority to realize a personal financial gain (2 N.T.C. § 3753 (b)); using confidential information to further personal economic interests (2 N.T.C. § 3753(c)); acquiring a financial interest in a tribal transaction raising a conflict of interest with official responsibilities (2 N.T.C. § 3753 (d)(1)); taking official action in a matter in which there is a personal economic interest (2 N.T.C. § 3753(e) (1)); securing a personal economic interest in a tribal contract (2 N.T.C. § 3753(f)(1); and acceptance of gratuities and loans from persons doing business with the Navajo Nation (2 N.T.C. § 3753 (m)).

The statements of Chairman MacDonald acknowledged allegations of "betraying the trust that the Navajo people put in me, selling the power of my office for personal gain, enriching myself at the expense of the people ... not just me, but the whole tribal government has been held up as corrupt, pervaded by kick backs, payoffs and favoritism." The Tribal Council minutes show the delegates were aware of these allegations made before the Senate Select Committee. In addition, Chairman MacDonald informed them of the allegations.

## BEST INTEREST

D. Tribal Council found that administrative leave was in the best interests of the Navajo people.

1. Navajo Nation Exhibit 2, Resolution CF-4-89,

Whereas Clause 3: The Navajo Tribal Council deems that a state of emergency exists in the management of the Navajo Tribal Council caused by the unique circumstances and events relating to the Office of the Chairman and the serious allegations raised personally against Peter MacDonald, Sr.

2. Navajo Nation Exhibit 1, Tr. 2/14/89-2/17/89 (Tribal Council delegates' discussion).

3. Navajo Nation Exhibit 1, Tr. 2/16/89, pp.27-30 (Statements of Peter MacDonald, Sr.).

a. I also want to thank you for listening to me the day before yesterday when I made my remarks here, for taking my remarks seriously and for avoiding precipitous actions which would have created even worse crises. I want to ask you to give these remarks the same fair-minded consideration. I don't pretend to have all the answers, but I do have some suggestions. Yes, we need to take action and that's exactly what we are going to do now. But the action needs to be based on principles and on concern for the long run implications of what we do. (p. 27)

b. Let me conclude by saying I do not want to go on leave without telling you also what an honor it has been to preside over the sessions and to chair these deliberations. I have real confidence in your wisdom, your dedication to the best interests of our people. Your ability to respond to a larger vision of what the future holds is very important and your willingness as has been expressed here to put aside personal grievances and self-interests in order to do what is best, what is fair and what is right. (p. 29)

4. Defendants introduced no evidence on the issue of whether Tribal Council found administrative leave to be in the best interests of the Navajo people.

In addition to the presumption of validity, there is another presumption which attaches to legislative acts. That is the presumption that the legislature acted from proper motives.

A second presumption guiding the courts is that the legislators acted from proper motives. If the legislative body did a proper and legal act, the court will not examine the motives of the legislators. Motives will be examined only to the extent needed to determine if the legislative action should be invalidated on grounds of fraud and bad faith. *Benally, supra.* at 275.

A proper motive of a legislative body is to act in the best interests of the people. This duty was imposed upon Navajo leaders from the earliest times and was recognized by the Navajo Supreme Court in its response to certified question number 4.

The Tribal Council minutes indicate the best interest of the Navajo Nation was a major consideration of the delegates. The words of Chairman MacDonald are in recognition of the duties of the delegates to act and ascribe proper motives to the actions of Tribal Council.

Finally, Resolution CF-4-89 acknowledges an emergency has been created by the allegations. When Tribal Council is faced with an emergency it may not properly decline to act.

## ADMINISTRATIVE LEAVE OR REMOVAL

II. Resolution CF-4-89 (Placing Peter MacDonald, Sr., on Administrative Leave with Pay and Removing All Legislative and Executive Authority) placed Peter MacDonald, Sr. on administrative leave with pay and did not remove him from Office.

A. Resolution CF-4-89: Placing Peter MacDonald, Sr., on Administrative Leave with Pay and Removing All Legislative and Executive Authority.

1. Whereas clause 2: On February 16, 1989, the Chairman of the Navajo Tribal Council, Peter MacDonald, Sr., allowed the Vice Chairman to preside over the Navajo Tribal Council session and indicted that he be placed on administrative leave with pay; and

2. Whereas clause 3: The Navajo Tribal Council deems that a state of emergency exists in the management of the Navajo Tribal Council caused by the unique circumstances and events relating to the Office of the Chairman and the serious allegations raised personally against Peter MacDonald, Sr.

3. Resolved clause 1: The Navajo Tribal Council hereby places Peter MacDonald, Sr., on administrative leave with pay until directed otherwise by the Navajo Tribal Council.

4. Resolved clause 2: Furthermore, the Navajo Tribal Council hereby removes all executive and legislative authority delegated by law to the Chairman of the Navajo Tribal Council from Peter MacDonald, Sr., while on administrative leave and until otherwise directed by the Navajo Tribal Council.

B. Navajo Nation Exhibit 1, Tr. 2/14/89-2/17/89 (Tribal Council Delegates' discussion)

C. Navajo Nation Exhibit 1, Tr. 2/14/89 pp. 30-35 (Statements of Peter MacDonald, Sr.):

1. I'm trying to talk about what is best for the Navajo people, not what's best for me. What does that mean? It means that there are some things you don't want MacDonald doing right now, based on the allegations, I'm sure that have been stated here, by signing checks or anything that authorized him to commit funds, and you want the tribal government to keep on functioning on a day by day basis. I'm sure you do not prefer a system of government like we see in South America where they have conflicts every couple of months. Don't you want to identify those functions that you think MacDonald shouldn't fulfill and those he can continue to discharge until you can make a determination? (p. 33)

2. I want to first say that I am here before you, as all of you know, accused of one of the most serious crimes I can think of, betraying the trust that the Navajo People put in me, selling the power of my office for personal gain, enriching myself at the expense of the people who are among the poorest of the poor in America. That's what I have been accused of. I am outraged at these charges, but I know you must be outraged at something else too as we talk here today and yesterday. You must be outraged at having been held up in ridicule. You must be outraged at the way the Navajo Tribal Government, not just me, but the whole tribal government has been held up as corrupt, pervaded by kickbacks, payoffs and favoritism. All I can tell you is I'm innocent and I'm confident that a court of law will find me innocent of any wrong doing, but I suspect that being innocent won't be enough to stand political avalanche that has been unleashed by the Senate Investigating Committee in Washington, D.C. I know you must be furious at me for anything I did or might have done to give credibility to these attacks from Washington. I know

some of you just feel that it really doesn't matter what I did or didn't do, what matters is that the world now thinks that *I did*, that your Chairman somehow has lost all credibility, that the tribal government has lost all credibility, and that sweeping action is essential to restore some faith in our government and our Council. I know, too, that this council must do something, must do something definitive if you are not to lose face when you return to your chapters. That I know. (pp. 30-31)

D. Navajo Nation Exhibit 1, Tr, 2/16/89, pp. 27-30 (Statements of Peter MacDonald, Sr.):

1. So let me put these suggestions to you:

(1) I propose that I go on administrative leave as outlined in the resolution presented by Don Benally as the substitute motion: (2) I propose that the Vice Chairman assume the post of acting Chairman during this period; (3) I request that the Council permit me to retain an office and staff to have access to such tribal records and to have the cooperation of officials so that I might proceed to clear my name and the name of the Navajo Government of the slurs and slanders of which we are accused. In that connection, I ask your leave to retain Counsel to advise me on legal issues and implications of those accusations and to represent me in my dealing with officials of the Federal Government on these matters because effective legal representation can be critical in securing a fair outcome. (p. 29)

2. I will now leave the Chair to go on leave and give the Vice Chairman the Chair and hopefully that you will use judgment to make your decision, as I've said earlier, independently with a great deal of soul-searching, remembering the words that we have spoken to each other over the past few days. Thank you very much. (p. 30)

E. 11 N.T.C. § 211

The Chairman, Vice Chairman and all members of the Tribal Council are subject to removal in the following manner:

(1)     For just cause:

(D) Chairman and Vice Chairman absent for three consecutive months without permission of Tribal Council.

The Navajo Nation Supreme Court, in its response to certified question number 4, provided guidelines for distingishing between administrative leave and removal. These guidelines were met in the matter of Peter MacDonald, Sr. Resolution CF-4-89 and the transcript of Tribal Council minutes from February 14, 1989 through February 17, 1989 show that an unusual situation of an emergency nature was facing the Navajo Nation as a result of the content of certain testimony before the Senate Select Committee and that placing Peter MacDonald, Sr. on leave would be in the best interests of the Navajo Nation.

Resolution CF-4-89 grants leave until further order of the Navajo Tribal Council.

The minutes of Tribal Council reveal extensive discussion of whether the Chairman was being put on administrative leave or removed. The Tribal Council delegates who opposed putting the Chairman on leave are the only ones who

raised the issues of removal and punishment. The delegates who spoke in favor of administrative leave remained adamant that leave was neither removal nor punishment. The comments of Mr. MacDonald himself show that he understood Tribal Council could limit or modify his powers. Further, he himself proposed that he go on administrative leave and did in fact place himself on administrative leave.

Finally, 11 N.T.C. § 211, 1, (D) makes leave not authorized by Tribal Council a ground for removal. This implies that the Chairman legitimately may be on leave with the consent of the Tribal Council.

## PROPER LEGISLATIVE PROCEDURE

III. The basic protections required by the Supreme Court were afforded to Peter MacDonald.
  A. Resolution CF-4-89 was passed in a properly convened session of the Navajo Tribal Council at which a quorum was present.

### QUORUM

1. 2 N.T.C. § 162 Number; time; duration
  (a) There shall be four regular sessions of the Navajo Tribal Council each year.
2. 2 N.T.C. § 172 Quorum
  (a) A quorum shall consist of a simple majority of all voting members of the Navajo Tribal Council.
3. Navajo Nation Exhibit 1, Tr. 2/14/89, p. 1
  a. "The meeting was called to order by Chairman Peter MacDonald, Sr., at 10:15 A.M., with a quorum of 63 council delegates present."
  b. "Chairman: Welcome to the regular Winter Session of the Navajo Tribal Council. The Winter Session of the Navajo Tribal Council will now come to order. We do have a quorum."
4. Navajo Nation Exhibit 1, Tr. 2/17/89, p. 1
  a. "The council meeting was called to order by Chairman Pro Tempore Marshall Plummer at 2:55 P.M. with (55) Council Members present. INVO-CATION: Council Delegate Nelson German."
  b. "CHAIRMAN: Members of the Tribal Council, Audience, Officials of the Bureau of Indian Affairs and Indian Health Service, Acting Chairman of the Tribe - Johnny R. Thompson, we appreciate you being here with us to hear us deliberate on this very important agenda. As all of you know, several events have happened since two or three days ago and as of yesterday a bigger event happened, wherein, the Chairman of our Tribe, Mr. Peter MacDonald, announced to the Council and to the public that he was taking administrative leave with pay. He gave a speech which I thought touched the hearts of each one of us, and we were most appreciative of his efforts and his feelings. After that, the Chair was turned over to the Vice Chairman to take over as the chairman of this council. And a vote was taken thereafter, wherein, the substitute motion recognizing the Vice Chairman, Mr. Johnny R. Thompson, to head this Council was defeated, along with other measures that

were included in that particular resolution.

5. Defendants presented no evidence on the issue of whether Tribal Council was properly convened with a quorum present.

## WINTER SESSION PROPERLY CONVENED

The winter session of the Navajo Tribal Council was properly convened. 2 N.T.C. § 162 (a) requires Tribal Council to meet in at least four sessions each year. These are commonly referred to as the winter, spring, summer and fall sessions. The winter session was convened with a quorum present. There was also a quorum on February 17, 1989, when Resolution CF-4-89 was passed. 2 N.T.C. § 172 (a) provides that a quorum of Tribal Council shall consist of a simple majority of the total membership of Tribal Council.

> The main motion which cited that myself and Mr. Irving Billy would become Chairman Pro Tem and Vice Chairman Pro Tem was passed, and it is for this reason that we are up here today. I want you as Council Delegates and Tribal leaders to know that our role is to facilitate, to coordinate the meetings and to address all of the items that are on this particular agenda that was approved by this Council. We do not have any authority over the executive branch whatsoever. And I want to make that very clear, not only to you as the Tribal Council Delegates and Tribal Leaders, but also for the Navajo Public. Navajo Nation Exhibit 1, Tr. 2/17/89, at p. 1.

## AGENDA PROPERLY ADOPTED

B. There was a properly adopted agenda

1. Navajo Nation Exhibit 1, Tr. 2/14/89.

2. Navajo Nation Exhibit 1, Tr. 2/15/89, p. 1. (Statement of Peter MacDonald): "Members of the Tribal Council: The discussion yesterday centered around preparing the Agenda of the Navajo Tribal Council Winter Session. After thorough discussion, we have agreed upon an agenda and that particular agenda that was agreed to by the Council by vote, I'd like to have that handed out to the Members of the Council and read."

3. Navajo Nation Exhibit 1, Tr. 2/15/89, pp. 1-2. (The AGENDA of THE NAVAJO TRIBAL COUNCIL, February 14, 1989, WINTER SESSION was read into the record. Item 5 is "Placing the Chairman and Vice Chairman on Leave with Pay; Appointing Interim Chairman and Vice Chairman.")

4. Defendants presented no evidence on the issue of a properly adopted agenda.

On February 14, 1989, the agenda prepared by the Advisory Committe was rejected. A motion was made that Advisory Committee prepare a new agenda.

(Exhibit 1, Tr. 2/14/89, pp. 7-8). A substitute motion was then made to place four items on the agenda (Exhibit 1, Tr. 2/14/89, pp. 8-9). The main motion subsequently became one to adopt an agenda which included all those items on the initially proposed agenda plus the items contained in the original substitute motion and items subsequently added by request to the substitute motions. (Exhibit 1, Tr. 2/14/89, pp. 56-57). The substitute motion was passed by 53 in favor, 29 opposed, 4 abstaining and 2 not voting. (Exhibit 1, Tr. 2/14/89, p. 52). At the time the agenda was adopted, the only dispute was over which agenda should be adopted and not by what procedures the agenda should be prepared. (Exhibit 1, Tr. 2/14/89, pp __ ).

Further, Chairman MacDonald stated that an agenda had been adopted and that agenda was read into the record at the direction of Chairman MacDonald. That agenda contained an item of placing the Chairman and Vice Chairman on leave with pay.

## MAJORITY VOTE

C. The resolution by which Peter MacDonald, Sr. was placed on leave passed by a majority vote.
  1. 2 N.T.C. § 172. Quorum
       (b) No resolution or motion of the Navajo Tribal Council shall be passed or otherwise acted upon unless a quorum is present. Where a quorum is present, any motion or resolution shall be passed if it receives a majority of all votes cast, irregardless of how many members actually vote and how many abstain, unless a larger proportion than a simple majority has been properly stipulated in advance.
  2. Navajo Nation Exhibit 2: Resolution CF-4-89: Certification showing 49 in favor, 13 opposed, 5 abstaining and 0 not voting.
  3. Navajo Nation Exhibit 1, Tr. 2/17/89, p. 1:
       "The Council meeting was called to order by Chairman Pro Tempore Marshall Plummer at 2:55 p.m. with (55) Council Members present. INVOCATION: Council Delegate Nelson German."
  4. Navajo Nation Exhibit 1, Tr. 2/17/89, p. 23 (Showing vote on Resolution CF-4-89)
  5. Defendants presented no evidence on the issue of whether the resolution passed by a majority vote.

The Tribal Code requires only that resolutions pass by a majority of those delegates voting and not a majority of those present.

The certification to Resolution CF-4-89 and the Tribal Council minutes show that 67 delegates voted and that 49 voted in favor of the resolution.

## BILL OF ATTAINDER

D. Resolution CF-4-89 placing Peter MacDonald, Sr. on administrative leave was not a bill of attainder.

    1. Resolution CF-4-89 did not legislatively determine guilt.

    a. Whereas Clause 3: The Navajo Tribal Council deems that a state of emergency exists in the management of the Navajo Tribal Council caused by the unique circumstances and events relating to the Office of the Chairman and the serious allegations raised personally against Peter MacDonald, Sr.

    b. Resolved Clause 1: The Navajo Tribal Council hereby places Peter MacDonald, Sr., on administrative leave with pay until directed otherwise by the Navajo Tribal Council.

    c. Resolved Clause 2: Furthermore, the Navajo Tribal Council hereby removes all executive and legislative authority delegated by law to the Chairman of the Navajo Tribal Council from Peter MacDonald, Sr., while on administrative leave and until otherwise directed by the Navajo Tribal Council.

    2. Navajo Nation Exhibit 1, Tr. 2/14/89-2/17/89 (Tribal Council delegates discussion)

    3. Defendants presented no evidence that Resolution CF- 4-89 was a bill of attainder.

## CASE LAW ON BILL OF ATTAINDER

The Navajo Nation Supreme Court in its response to certified question number 4 defined bill of attainder and provided tests for determining if legislation is in fact a bill of attainder.

Although defendants presented no evidence on the issue of bill of attainder, Defendant MacDonald did cite to the Court the case of *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). *Nixon* was also cited by the Navajo Nation Supreme Court in its discussion of bills of attainder.

*Nixon* was a challenge to an act passed by Congress. The act provided that the Administrator of General Services take custody of the papers and tape recordings made by Nixon while he was President, and develop regulations for public access. *Nixon* challenged the act on four grounds, one ground being that the act was a bill of attainder.

The U.S. Supreme Court held the act was not a bill of attainder but rather was nonpunitive legislative policy-making justified by a public need.

The Court in *Nixon* judged the act by several tests and by none of them found a bill of attainder.

## HISTORICAL TEST

The first test was historical, what was regarded as legislative punishment in England. Those were generally imprisonment, banishment, and the punitive confiscation of property by the sovereign. In addition, the American experience had added one more to the historical category, that being "a legislative enactment designated individuals or groups from participation in specified employments or vocations." *Nixon*, 53 LEd 2d at 910-911.

The Court found none of the above applied. Nixon claimed that the tapes and papers were his personal property. The act provided that Nixon would receive "just compensation." "This undermines even a colorable contention that the Government has punitively confiscated appellant's property, for the 'owner' [thereby] is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Id.*

## FUNCTIONAL TEST

The Court, mindful that "new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee" applied the functional test. The functional test examined the law in dispute to determine whether it "reasonably can be said to further nonpunitive legislative purposes." The Court found that there were public interests or purposes served by the act and therefore it was not designed to inflict punishment on Nixon. *Nixon*, at 912-913.

The functional test reguires an analysis of the public interests which are furthered by the legislation. This analysis is possible without resort to the legislative record or other sources.

## MOTIVATIONAL TEST

The third test, the motivational one, requires an examination of the legislative record and other evidentiary sources to determine whether there was an intent to punish. The Court examined the legislative record and the evidence and found no intent to punish. The Court did find that the record supported its conclusions under the functional test. *Nixon*, at 913-914.

The Court stated that it is not necessary that the legislature actually state blameworthiness or punishment. "But the decided absence from the legislative history of any congressional sentiments expressive of this purpose is probative of nonpunitive intentions and largely undercuts a major concern that prompted the bill of attainder prohibition: the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient openly to assume the mantle of judge - or worse still, lynch mob." *Nixon*, at 914.

In furtherance of the motivational test, the Court examined the provisions of the act itself and found no intent to punish. *Nixon*, at 915. The Court also looked at whether a less burdensome alternative existed by which the legislature could have achieved its purposes. Nixon had suggested that a provision for civil suit by the Attorney General or the Administrator of General Services would be sufficient to accomplish the purposes of the act. The Court did not find this less burdensome:

> We have no doubt that Congress might have selected this course. It very well may be, however, that Congress chose not to do so on the view that a full-fledged judicial inquiry into appellant's conduct and reliability would be no less punitive and intrusive than the solution actually adopted. For Congress doubtless was well aware that just three months earlier, appellant had resis-

ted efforts to subject himself and his records to the scrutiny of the Judicial Branch. *Nixon*, at p. 916

In the instant case, there was some discussion at various proceedings on whether all tests must be met to find a bill of attainder, or whether one is sufficient. There is absolutely no basis in the instant case to find a bill of attainder under any of the tests. For purposes of this case, it is irrelevant whether the tests are to be applied separately and independently or whether they are cumulative.

This Court is of the opinion that its findings and above conclusions on the conditions and elements of administrative leave satisfy the tests for bill of attainder. The Court will, however, discuss the application of the tests to Resolution CF-4-89.

The Navajo Nation Supreme Court has already stated there is no property interest in public office. *In Re Removal of Katenay*, 6 Nav. R. 81 (1989); *In the Matter of Certified Questions II: Navajo Nation v. MacDonald*, 6 Nav. R. 105, 119 (1989). This concept is also recognized in Arizona and New Mexico. *Mecham v. Gordon* 156 Ariz. 279 (1988); *Reese v. Dempsey*, 48 N.M. 417, 152 P.2d 157, 163 (1944). Even if some property interests were to be found, the administrative leave is with pay so that monetarily Mr. MacDonald is in the same position he would be in were he not on administrative leave.

Further, Chairman MacDonald is not barred from specified employment or vocations. The Court understands "specified employments" to mean working for a specified employer such as the federal government, the tribal government, General Motors, etc., and "vocations" to mean types of employment or careers such as clergyman, computer programmer, medical doctor, etc. Chairman MacDonald is not barred from tribal employment. It would be a contradiction to being on administrative leave with pay. The Court is not prepared to say that being a Chairman is a vocation, but Chairman MacDonald is certainly not barred from being Chairman of the Navajo Tribal Council.

There are public purposes and interests which are furthered by the administrative leave. Certainly the need to demonstrate to the public that the Navajo Nation has the ability and the resources to handle governmental crisis is a public purpose.

The minutes of Tribal Council discussion do not reveal any desire or intent to punish on the part of the proponents of administrative leave. Neither is this found in the resolution itself. Although the resolution is addressed to a specific individual, it is not punishment by any test the Court can apply. The U.S. Supreme Court in Nixon most eloquently expresses this Court's views on the matter:

> By arguing that an individual or defined group is attained whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classifications and punishment.... However expansive the prohibition against bills of attainder, it surely was not intended to serve as a vari-

ant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some person or groups but not all other plausible individuals. In short, while the Bill of Attainder Clause serves as an important 'bulwark against tyranny,' *United States v Brown*, it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all. *Nixon*, at p.908-909.

# RESOLUTION CMA-10-89

I. Tribal Council had reasonable grounds to believe that Johnny R. Thompson had seriously breached his fiduciary trust to the Navajo people and that administrative leave was in the best interests of the Navajo people.

    A. There were serious allegations of breach of fiduciary duty solicited under oath by a properly authorized investigatory body.

        1. Navajo Nation Exhibit 1, Tr. 2/14/89-3/10/89 (Tribal Council delegates' discussion)

        2. Navajo Nation Exhibit 3, 2/7/89, Senate Select Committee Hearings at pp. 55-61

        3. Navajo Nation Exhibit 2, Resolution CMA-6-89, passed March 1, 1989, Amending the Plan of Operation of the Navajo Nation Department of Justice; Clarifying the Legal Powers, Authority and Status of Persons Occupying the Positions of Attorney General and Deputy Attorney General; Authorizing and Directing the Navajo Nation Department of Justice to Institute Legal Proceedings Regarding the Big Boquillas Ranch Transaction; and Confirming the Authorization and Directive to the Attorney General to Defend the Navajo Tribal Council in Certain Proceedings pending in Tribal Court

        4. Whereas Clauses 10-11:

            Whereas 10: On February 17, 1989, the Navajo Tribal Council received (a) the *Final Report of the Navajo Tribal Special Counsel Concerning the Big Boquillas Ranch Purchase*, authored by Michael D. Hawkins and dated January 27, 1989 (the "Hawkins Report"); (b) a Supplemental Report to the Hawkins Report dated February 17, 1989, appended to which were summaries of sworn testimony of certain witnesses who appeared before the United States Senate Select Committee on Indian Affairs (the "Select Committee"); and (c) an opinion and recommendation from the Navajo Nation Attorney General concerning legal action by the Navajo Nation with respect to the Big Boquillas Ranch transaction; and

            Whereas 11: The Hawkins Report, as supplemented, demonstrates good cause to believe the Navajo Nation, and in particular the Navajo Tribal Council, was defrauded by the sellers, Peter MacDonald, Sr., while serving as the Chairman of the Navajo Tribal Council, and others in connection with the Nation's purchase of the Big Boquillas Ranch.

There were allegations made to the Senate Select Committee that the transaction of purchasing the Big Boquillas Ranch had involved a fraud upon the

Navajo Nation and the realization of personal profit by some of those involved in the transaction.

Resolution CMA-6-89 shows that Michael Hawkins' report of his investigation of the Big Boquillas purchase raised sufficient questions regarding the purchase so as to become one basis for directing the Navajo Nation Department of Justice to institute legal proceedings regarding the Big Boquillas transaction.

At trial Defendant Thompson was called by the plaintiffs as a witness. He said that he had been present in the summer of 1988 when Hawkins had made an oral report to a joint committee of the Advisory Committee and the Budget and Finance Committee but that he (Thompson) had never conveyed any information to Tribal Council regarding that report. Thompson also stated that he had signed documents in furtherance of the Big Boquillas purchase but that he did not recall receiving a report from the Navajo Nation Justice Department advising against signing the documents.

There was sufficient opportunity and reasonable grounds for Vice Chairman Thompson, in carrying out his fiduciary duties to the Navajo Nation, to seek to ascertain that the Big Boquillas transaction was free of serious questions as to the good faith and disclosures required in the transaction. There are many indications that Vice Chairman Thompson failed to avail himself of the opportunity. There is no evidence that he took any steps to assure that there were no serious questions regarding the Big Boquillas purchase. Yet the questions were serious enough that soon after the purchase, the Navajo Nation engaged the services of Michael Hawkins to investigate.

    B. There were serious allegations combined with some evidence of violation of tribal law which, if true, could result in removal.

        1. Ethics in Government Act.

           a.  2 N.T.C. § 3753 (a)
           b.  2 N.T.C. § 3753 (b) (2) (F)
           c.  2 N.T.C. § 3753 (m) (1)
           d.  2 N.T.C. § 3754 (C)
           e.  2 N.T.C. § 3755 (a) (9)
           f.  2 N.T.C. § 3757 (a) (1) (A)

        2. 11 N.T.C. §§ 171-179, Subchapter 9. Campaign Expense; contributions

        3. Navajo Nation Exhibit 4; and Exhibit 3, 2/2/89, at 28-29, 32-33, 68-72 (see also Exhibit 3 attachment, Paddock list of payment and gratuities to MacDonald), and testimony of Gloria Dennison.

        4. Navajo Nation Exhibit 5, Memorandum to Attorney General Michael Upshaw dated 2/21/89 from Chairman Peter MacDonald, Sr. and Vice Chairman Johnny R. Thompson terminating Upshaw's services and signed by MacDonald and Thompson.

        5. Navajo Nation Exhibit 6, Memorandum to Anthony Lincoln dated 3/7/89 from Chairman MacDonald and Vice Chairman

Thompson appointing Lincoln, Executive Secretary of the Navajo Nation and signed by MacDonald and Thompson.

6. Navajo Nation Exhibit 7, Letter to Eric Dahlstrom dated 3/9/89 from Chairman MacDonald and Johnny R. Thompson barring Dahlstrom from sitting in Tribal Council Chambers and signed by MacDonald and Thompson.

7. Navajo Nation Exhibit 10, Memorandum to Eric Dahlstrom dated 2/17/89 from Johnny R. Thompson, Chairman (Acting) terminating Dahlstrom's services and signed by Johnny R. Thompson. The memorandum contains the statement "On February 16, 1989, I assumed the Chairmanship of the Navajo Tribal Council pursuant to 2 N.T.C. § 284(c)."

8. Navajo Nation Exhibit 11, Memorandum to Wilbur Kellogg, Chief of Police, dated 3/10/89, from Chairman MacDonald and Vice Chairman Thompson directing Kellogg to secure the Tribal Council Chambers and Legislative Offices and signed by MacDonald and Thompson.

9. Navajo Nation Exhibit 12, Memorandum dated 3/10/89 labeled EXECUTIVE ORDER to Wilbur Kellogg, Chief of Police, from Chairman MacDonald and Vice Chairman Thompson and signed by MacDonald and Thompson. The memorandum reads in full:

> We hereby issue this Order for you to protect the Office of the Chairman/Vice Chairman from damage or takeover. You still operate under the direction of the undersigned Chairman and Vice Chairman of the Navajo Nation. The Division of Public Safety is directed and ordered to recognize Peter MacDonald, Sr. as Chairman and Chief Executive Officer of the Navajo Nation and Johnny R. Thompson as Vice Chairman and Chief Executive Officer when Chairman is out of Window Rock, Arizona.

10. Navajo Nation Exhibit 13; Memorandum dated 3/10/89 to Senator James Henderson from Chairman MacDonald and Vice Chairman Thompson terminating Henderson's services and signed by MacDonald and Thompson.

11. Navajo Nation Exhibit 14 (Exhibit 14 consists of 58 memoranda and 4 letters written between February 20, 1989, and March 9, 1989 with inside address and signature line indicating they are from Peter MacDonald, Sr., Chairman of the Navajo Tribal Council, *but* signed by Johnny R. Thompson. All correspondence is in the nature of conducting tribal business.

12. Navajo Nation Exhibit 2

   a.    Resolution CF-4-89, Placing Peter MacDonald, Sr., on Administrative Leave with Pay and Removing All Legislative and Executive Authority, passed February 17, 1989

b. Resolution CF-5-89, Transferring the Office of Legislative Affairs Completely and Directly under the Navajo Tribal Council, passed February 21, 1989

c. Resolution CMA-6-89, Amending the Plan of Operation of the Navajo Nation Department of Justice; Clarifying the Legal Powers, Authority and Status of Persons Occupying the Positions of Attorney General and Deputy Attorney General; Authorizing and Directing the Navajo Nation Department of Justice to Institute Legal Proceedings Regarding the Big Boquillas Ranch Transaction; and Confirming the Authorization and Directive to the Attorney General to Defend the Navajo Tribal Council in Certain Proceeding pending in Tribal Court, passed March 1, 1989

d. Resolution CMA-10-89, Placing Vice Chairman Johnny R. Thompson on Administrative Leave with Pay Until He is Cleared of Allegations of Wrong-doing; Appointing an Intertim Chairman and Interim Vice Chairman of the Navajo Tribal Council

13. Opening statement of counsel for Defendant Thompson.

14. Defendants presented no evidence on the issue of violation of tribal law.

Each candidate whose name appears on a ballot in a Navajo Tribal election is required to file an itemized statement of receipts and expense with the Board of Election Supervisors (11 N.T.C. § 172(a)).

This statement must contain a complete record of receipts and expenditures (11 N.T.C. § 172(b)). 11 N.T.C. § 175(a)(l) sets a ceiling on campaign expenditures of $1.00 per registered voter. This amount applies to the combined Office of Chairman and Vice Chairman. A candidate who expends more money than allowed is guilty of an offense (11 N.T.C. § 176). A candidate who knowingly files an incorrect statement is subject to a penalty and may be barred from holding office (11 N.T.C. § 177). It is unlawful for a corporation or nonmember of the Navajo Tribe to make a contribution (11 N.T.C. § 179).

The Candidates' Campaign Expense Statement which is signed by Peter MacDonald shows the total amount of contributions as $69,430.95 and the total amount of expenditures as $75,191.29.

The testimony before the Senate Select Committee contained allegations that campaign contributions had been solicited and obtained from Navajo and non-Navajo contractors. John Paddock, a non-Navajo, testified before the Senate Select Committee that he had contributed air transportation worth $39,000.00 to the MacDonald-Thompson campaign. This contribution was not disclosed and, if true, would cause the MacDonald-Thompson campaign to exceed the expenditures allowed by 11 N.T.C. § 175(a) (1).

At trial, Vice Chairman Thompson was called as a witness by plaintiffs. Under oath, he stated that he did not recall filing the required campaign statement. If true, the Vice Chairman could be subject to the penalty provision of subchapter

9 of Title 11 of the Navajo Tribal Code.

The Ethics in Government Act establishes standards of conduct for tribal officials and, if a violation of the Act is proven, one sanction is removal from office. 2 N.T.C. § 3757 (a) (1) (A). The standards of conduct include conduct reflecting credit upon the Navajo people and government and complying with "all applicable laws of the Navajo Nation with respect to their conduct in the performance of the duties of their respective office or employment," (2 N.T.C. § 753 (a)); refraining from "adversely affecting the confidence of the people in the integrity of the government of the Navajo Nation," (2 N.T. C. § 3753 (b)(2)(F); neither soliciting nor accepting gifts, favors, benefits, etc. in an aggregate amount in excess of $100.00 (2 N.T.C. § 3753 (m)(1); filing by elected officials and employees a Statement of Economic Interests which includes all required information for the previous twelve months (2 N.T.C. § 3754(c)), such information gift or loans in excess of $100.00.

If the air transportation Paddock alleged he contributed is true, it appears that it should have been reported under the elections laws and/or the Ethics in Government Act.

The memoranda and letters signed by Vice Chairman Thompson between February 17, 1989, and March 10, 1989, raise questions of violation of tribal laws. On February 17, 1989, the Navajo Tribal Council placed Chairman Peter MacDonald on administrative leave and relieved him of his executive and legislative powers until otherwise directed by Tribal Council. In addition, Tribal Council passed Resolution CMA-6-89 relative to the Navajo Nation Department of Justice Plan of Operation, and Resolution CF-5-89 relative to the Office of Legislative Affairs.

Despite these resolutions, Defendant Thompson continued to act in concert with Defendant MacDonald contrary to the provision of Resolutions CF-4-89, CF-5-89, and CMA-6-89.

The memoranda and letters contain indications that Vice Chairman Thompson regarded Defendant MacDonald as having full executive and legislative authority. At trial, counsel for Defendant Thompson, in his opening statement, said that Thompson was following the instruction of Chairman MacDonald. When Thompson was called by the plaintiffs he admitted the signature on the documents contained in Exhibits 5-14 was his.

Tribal Council found reasonable grounds to believe there were serious allegations against Chairman MacDonald of breach of fiduciary trust sufficient to make administrative leave in the best interests of the Navajo people. For Defendant Thompson to act contrary to Resolution CF-4-89 could subject him to the provisions of 2 N.T.C. § 3753 (a) and (b) (2) (F). Tribal Council had reasonable grounds to believe these were violations of tribal law.

## ADMINISTRATIVE LEAVE OR REMOVAL

II. Resolution CMA-10-89 (Placing Vice Chairman Johnny R. Thompson on Administrative Leave with Pay until he is cleared of Allegations of wrongdoing; Appointing an Interim Chairman and Interim Vice Chairman of the Navajo Tribal Council) placed Johnny R. Thompson on administrative leave with pay and did not remove him from office.

    A. Navajo Nation Exhibit 2, Resolution CMA-10-89: Placing Vice Chairman Johnny R. Thompson on Administrative Leave with Pay

        1. Whereas Clauses 2-10

        (2) By resolution CF-4-89, the Navajo Tribal Council placed Chairman Peter MacDonald, Sr., on paid administrative leave; and

        (3) In spite of Resolution CF-4-89, Vice Chairman Johnny R. Thompson is unwilling and has failed to carry out the duties and obligations of the Office of the Chairman and failed to promote and preserve the interest of the Navajo Nation as expressed by the Navajo Tribal Council; and

        (4) In spite of offers by the Navajo Tribal Council to Johnny R. Thompson to take command as Acting Chairman, he has indicated that he will be subject to the influence of Peter MacDonald, Sr., in the exercise of the authority of the office defeating the purpose of Resolution CF-4-89; and

        (5) Vice Chairman Johnny R. Thompson himself is implicated by allegations that the MacDonald/Thompson candidacy filed fraudulent campaign contribution and expense reports with the Navajo Election Committee and accepted campaign contributions from non-Navajos, which are grounds for disqualification from office; and

        (6) The *Hawkins Report* was delayed from the Navajo Tribal Council by the Vice Chairman and the Advisory Committee of the Navajo Tribal Council when they were under a duty to forward the position that tribal officials were exonerated; and

        (7) It is inevitable that Vice Chairman Thompson will have to devote substantial time to defending himself against these allegations; and

        (8) The allegations made against Chairman MacDonald and Vice Chairman Thompson need to be investigated by appropriate entities of the Navajo Nation; and

        (9) Loyalty to the Navajo Nation and leadership integrity and credibility are essential to execution of duties and responsibilities of the Office of the Chairman and Vice Chairman; and

        (10) The Navajo Tribal Council, in the interest of preserving and protecting the sovereignty of the Navajo Nation, has inherent authority to declare that the Chairman or Vice Chairman of the Navajo Nation is unable to fully and diligently carry out the duties and obligations of their offices, and to appoint an Interim Chairman and Interim Vice Chairman until the Chairman and Vice Chairman can establish their fitness to lead the Navajo Nation.

        2. Resolved clauses 1-2:

        (1) The Navajo Tribal Council hereby declares that Vice Chairman Johnny R. Thompson is unable to fully and diligently carry out the duties and obligations of his office.

(2) The Navajo Tribal Council further places Vice Chairman Johnny R. Thompson on leave with pay until allegations of wrongdoing against him are cleared and the Navajo Tribal Council is satisfied that he has the ability to lead.

3. Resolved Clauses 5-6:

(5) The Navajo Tribal Council directs that this resolution shall become effective immdiately upon passage, and further, no part of this resolution shall be amended or rescinded except by majority vote of the full membership of the Navajo Tribal Council.

(6) The Navajo Tribal Council further withdraws all legislative and executive authority vested by Tribal law in Vice Chairman Johnny R. Thompson.

B. Navajo Nation Exhibit 1, Tr. 2/14/89-3/10/89 (Tribal Council delegates' discussion)

C. Defendants presented no evidence on the issue of whether Resolution CMA-10-89 was administrative leave or removal.

Resolution CMA-10-89 by its terms meets all the requirements for administrative leave as required by the Navajo Nation Supreme Court. Unusual circumstances required the leave. Tribal Council found that leave was in the best interest of the Navajo Nation. The leave is to be ended when the allegations against the Vice Chairman are resolved and Tribal Council is satisfied that he can resume his duties. At that time, he may return to his duties. Finally, being on leave with pay is inconsistent with being removed, which would preclude monetary benefits.

## PROPER LEGISLATIVE PROCEDURE.

III. The basic protections required by the Supreme Court were afforded to Johnny R. Thompson.

A. Resolution CMA-10-89 was passed in a properly convened session of the Navajo Tribal Council at which a quorum was present.

1. Navajo Nation Exhibit 1, Tr. 3/10/89, p. 1: The meeting was called to order by Chairman Pro Tem Marshall Plummer at 11:45 A.M., at the Navajo Education Center, Window Rook, Navajo Nation (Arizona) with a quorum of 46 Council Delegates present.

2. Defendants presented no evidence on the issue of whether Tribal Council was properly convened.

The Court has already addressed whether there was a properly convened session of Tribal Council. There was a quorum present on March 10, 1989.

B. There was a properly adopted agenda.

The Court has already addressed this question and found that the session of Tribal Council which convened on February 14, 1989, properly adopted an agenda.

C. Resolution CMA-10-89 passed by a majority vote.
   1. 2 N.T.C. § 172 *Quorum*
      (b) No resolution or motion of the Navajo Tribal Council shall be passed or otherwise acted upon unless a quorum is present. When a quorum is present, any motion or resolution shall be passed if it receives a majority of all votes cast, irregardless of how many members actually vote and how many abstain, unless a larger proportion than a simple majority has been properly stipulated in advance.
   2. Navajo Nation Exhibit 1, Tr. 3/10/89, p. 1:
      The meeting was called to order by Chairman Pro Tem Marshall Plummer at 11:45 A.M., at the Navajo Education Center, Window Rock, Navajo Nation (Arizona) with a quorum of 46 Council Delegates present.
   3. Navajo Nation Exhibit 1, Tr. 3/10/89, p. 17
   4. Navajo Nation Exhibit 2, Resolution CMA-10-89: Placing Vice Chairman Johnny R. Thompson on Administrative Leave with Pay until He is Cleared of Allegations of Wrongdoing; Appointing an Interim Chairman and Interim Vice Chairman of the Navajo Tribal Council. Certification showing 37 in favor and 2 opposed, and 6 abstaining.

Resolution CMA-10-89 was passed when a quorum of Tribal Council delegates was present. The resolution passed by 37 in favor and 2 opposed. This was a majority of those voting. At trial, there were some statements by counsel for the defendants that a quorum had not been present. Defendants, however, presented no evidence on the issue of a quorum. The Tribal Council minutes state that a quorum was present. In the absence of evidence to the contrary, the Court finds a quorum was present.

## BILL OF ATTAINDER

D. Resolution CMA-10-89 was not a bill of attainder.
   1. Navajo Nation Exhibit 2, Resolution CMA-10-89
   2. Navajo Nation Exhibit 1, Tr. 2/14/89-3/10/89 (Tribal Council delegates' discussion)
   3. Defendants presented no evidence on the issue of bill of attainder.

The Court has discussed bills of attainder above. Although Resolution CMA-10-89 specifically refers to Johnny R. Thompson, the Court cannot find that there was punishment under the tests, historical, functional, and motivational, as set out in *Nixon, supra*, adopted by the Navajo Nation Supreme Court.

The same reasoning that applied to Resolution CF-4-89 applies to Resolution CMA-10-89.

There is no indication of an intent to punish Vice Chairman Thompson. There was a three week time period between the passage of Resolution CF-4-89 and CMA-10-89. This fact, coupled with the Tribal Council minutes and Resolution

CMA-10-89, convinces the Court that the Vice Chairman was observed and evaluated separate and independent from Chairman MacDonald and that this observation and evaluation led Tribal Council to the conclusion that public interest would be served by placing the Vice Chairman on administrative leave.

The Court has already set out two of the fundamental presumptions to which Tribal Council and any legislative body are entitled: the presumption that legislative acts are valid, and the presumption that the legislature acts from proper motives which include the best interests of the people.

It is clear from the exhibits that the Vice Chairman did not feel bound by the decision of the majority of the governing body. Contrary to the most fundamental right of a legislative body to in fact be the legislative body, the Vice Chairman took actions in conflict with Tribal Council resolutions and the Navajo Tribal Code.

Whatever the interpretations and understandings upon which the Vice Chairman acted, his actions between February 17, 1989 and March 10, 1989, are consistent with a pattern of ignoring Tribal Council and, ultimately, tribal law. The Court is specifically referring to the failure to file campaign and disclosure statements and the failure to convey to Tribal Council the contents of the Hawkins Report.

Tribal Council, whose duty is to provide for the health, safety and welfare of the Navajo Nation, cannot fulfill its duty when the individual to whom Tribal Council must look to for administration of its laws indicates that he will pick and choose which acts of Tribal Council he will honor. When this happens a non-punitive legislative purpose is clearly served and the public interest is furthered when the situation is resolved.

## DEFENDANTS OTHER THAN MACDONALD AND THOMPSON

There were 24 defendants other than MacDonald and Thompson named in the original complaint. At the time of trial on May 2, 1989, 15 of those defendants had been dismissed. The defendants remaining in the case are Howard Bitsuie, Erwin "Bo" Bowman, Patricia Damon, Herman Light, William Morgan, Richie Nez, Robert Shorty, Kee Ike Yazzie, and Carol Retasket.

Thomas J. Hynes filed an answer for MacDonald and the other defendants. Daniel Deschinny filed a separate answer and counterclaim on behalf of Johnny R. Thompson. The counterclaim was dismissed.

At trial, Defendant Carol Retasket indicated she was representing herself but filed no separate answer.

All defendants other than MacDonald and Thompson chose to rely solely on the issue of the validity of resolutions CF-4-89 and CMA-10-89 and presented no individual defenses. They are heretofore bound by the Court's decision on the issues regarding MacDonald and Thompson.

## SOVEREIGN IMMUNITY

On or about March 24, 1989, Defendants filed a Motion to Dismiss on the grounds of sovereign immunity. At the hearing on the preliminary injunction on April 18, 1989, counsel for Defendants, on the record, informed this Court that the Supreme Court had disposed of the question of whether the Navajo Nation Sovereign Immunity Act was a bar to suit. Counsel then stipulated to the preliminary injunction and trial was set for May 2, 1989.

Since this Court finds the Navajo Tribal Council resolutions CF-43-89 and CMA-10-89 as valid, the Defendants have no Official Capacity or duties protected by the Navajo Sovereign Immunity Act.

## ORDER

Based upon the foregoing Findings of Fact and Opinion, the Court hereby Orders that:

(a) Resolutions CF-4-89 and CMA-10-89 are lawful and enforceable Resolutions of the Navajo Tribal Council which divested Chairman MacDonald and Vice Chairman Thompson of their legislative and executive powers; and

(b) The termination of employment of each of the other Defendants was lawful and each Defendant thereafter had no authority related to his/her former position; and

(c) Based on the above declaration of the validity of the leave resolutions and employment terminations, and the Court's acceptance of the parties' stipulation on the record that Defendants MacDonald and Thompson do not recognize the validity of the resolutions placing them on leave and have continually exercised purported official authority at all times following the effective dates of their leave resolutions, Chairman Peter MacDonald, Sr. and Vice Chairman Johnny R. Thompson and other Defendants are hereby permanently enjoined from attempting to assert official authority which has been declared withdrawn.

The COURT further ORDERS that the Defendants are permanently enjoined as follows:

A. Each Defendant is restrained from attempting to exercise any official powers and duties as an official employee, or agent of the Navajo Nation, unless further authorized by this Court; and

B. Each Defendant is restrained from entering or remaining in Tribal office for the purposes of conducting business as employee or official of the Navajo Tribal Government except as provided in this order; and

C. Each Defendant is restrained from removing or destroying any Tribal records and from using any Tribal property including any credit cards, telephones, airplanes, vehicles, xerox machines, computers, office equipment, offices, and from issuing checks from Tribal accounts; unless further ordered by this Court; and

D. Each Defendant is enjoined from issuing or approving any orders, contracts, travel authorizations, requests for payments, purchase order, and travel reimbursements; unless further authorized by this Court; and

E. Each Defendant is enjoined from prohibiting or obstructing the duly appointed officials of the Navajo Nation and their employees from entering into Tribal buildings; and

F. Each Defendant is restrained from interfering with the duties of duly appointed officials of the Navajo Nation and their employees.

For purposes of this Order, wherever the term "Defendant" is used it shall be deemed to apply to any officer, agent, servant, employee, counsel, or any person acting in concert with them or on his or her behalf. Furthermore, other than Chairman Peter MacDonald, Sr. and Vice Chairman Johnny R. Thompson, nothing in this Order should be construed as prohibiting any Defendant to reapply for his or her former position or to apply for any other Tribal office. Such as, the prohibitions of this Permanent Injunction will not apply to any such bona fide reapplication and rehiring of the Defendant by the Navajo Nation.

The purported official acts of Chairman MacDonald and Vice Chairman Thompson taken after they were placed on administrative leave are declared null and void.

The Navajo Department of Law Enforcement is hereby ordered to enforce and execute the terms of this PERMANENT INJUCTION.

A security bond is not required pursuant to Rule 18 of the Navajo Rules of Civil Procedure because the Navajo Nation is a plaintiff in this action.

This Permanent Injunction and Declaratory Judgment is effective at the hour of issuance and shall continue in effect until further order of this Court.

The term of the stipulated Preliminary Injunction entered by the parties on April 19, 1989 shall remain in effect until further order of this Court.

Ordered this 17th day of May, 1989, at the hour of 10:25 a.m.